# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

IN RE:
NATIONAL BOOK WAREHOUSE, INC.    Case No. 06-02227
THE BOOK MARKET, INC.    Case No. 06-02226
    Debtors    (Administratively Consolidated)
    Chapter 11
    Judge George C. Paine, II

## MEMORANDUM

David Hinkle, Michael Mincey, Suntrust Bank, and the Unsecured Creditors Committee's filed cross motions for summary judgment on the amount of Suntrust Bank's allowed secured claim pursuant to 11 U.S.C. § 506(a). More specifically, Suntrust and the former principals of National Book Warehouse Inc. and The Book Market, Inc., Michael Mincey and David Hinkle (hereinafter collectively "Suntrust"), assert that Suntrust's allowed secured claim in this case should be valued using replacement costs on the petition date. The Unsecured Creditor's Committee (hereinafter "Committee") contends that the proper standard for valuation is liquidation.[1] For the reasons contained herein, the motions of Suntrust and the Committee are granted in part and denied in part.

---

[1] The original cross motions of the parties also raised the issue of the timing of valuation as an issue. However, at the Tuesday, May 15, 2007 hearing, the parties conceded that valuation was to occur as of the petition date, but continued to disagree on the proper standard for valuation.

## *A. Facts*

Most of the relevant facts are not in dispute.[2] The debtor's approved amended disclosure statement sets forth the history of these debtors as follows:

A. History of Debtors

National Book Warehouse, Inc. is a Delaware corporation headquartered in Tennessee that specializes in selling publisher's overstocks, remainders and special purchases at up to 80 percent off cover prices. The inventory includes recent best-selling fiction, children's books and cookbooks, plus material on health, fitness and religion.

Book Market stores operated by The Book Market, Inc. offer generally the same inventory selection as the Book Warehouse stores, except that Book Market stores are temporary stores, with inventory typically stacked in a no-frills, salvage-type arrangement, and with shortterm store leases, usually of three- or four-month duration. Book Market stores are usually located in regional malls and other high-visibility locations.

The Debtors also place books in Vanity Fair stores for sale by Vanity Fair on a consignment basis. Vanity Fair is an unrelated third party.

As of the Petition Date, the Debtors operated 100 Book Warehouse locations and temporary Book Markets in leased locations nationwide, including a Book Market in Lebanon, Tennessee. Together, the Debtors operate one of the largest privately-held bookstore chains in the United States.

The Debtors have been in business for many years. NMD, Inc., a Delaware company, acquired the Debtors in April 2001, and continues to hold all of the stock of the Debtors. The current officers of the Debtors and the owners of NMD, Inc. are David Hinkle and Michael Mincey. Since commencing these bankruptcy cases, the Debtors have continued to pay their officers, Mr. Hinkle and Mr. Mincey, the same salaries as they were paid in 2006 prior to the filing of these cases: $24,103 each per month.

The Debtors occupy warehouse and office premises located at 5700 Casey Drive, Knoxville, Tennessee. This space is occupied pursuant to a lease dated April 2004 between NBW and Winslow Corner, LLC. Winslow Corner, LLC is owned by David Hinkle and Michael Mincey.

The Debtors' operations were profitable after the companies were acquired. However, the Debtors suffered a small overall loss in 2004. Through May of 2005, the Debtors were ahead of budgeted sales for the

---

[2] The parties acknowledged that only partial summary judgment, if any, could be granted. Although most of the factual history of the debtor and this case are undisputed, the exact dollar figures involved in calculating Suntrust's claim remain materially disputed facts.

year, on-target for profitable operations, and actively growing, including opening new locations. After Hurricane Katrina and the other hurricanes of last summer's disastrous season, sales dropped dramatically, and with rising gas prices, by September 2005, the Debtors were more than $3 million under budget for both sales and projected net income. Operations continued to decline for the remainder of the year. For the year ended December 31, 2005, the Debtors had unaudited gross revenues on a consolidated basis in excess of $51,000,000 and net loss including interest expense of approximately $4,000,000.

The Debtors had 134 permanent stores and 62 temporary stores as of December 2005. In the six months preceding the commencement of these Chapter 11 Cases, the Debtors made aggressive plans to deal with the challenges facing their businesses. The Debtors began using owned excess inventory, which was roughly three months worth of supply to area stores, and reducing cash flow needed for operations. The Debtors closed more than 30 National Book Warehouse stores and significantly reduced overhead in an effort to stabilize the business and facilitate continued operations. Unfortunately, sales at the on-going stores were less than budgeted during the first months of 2006.

The Debtors commenced these Chapter 11 Cases after it became clear that an out-of court alternative could not be completed in sufficient time to address pressing liquidity issues. Additionally, on or about April 30, 2006, SunTrust Bank, which at the time of the commencement of these Cases asserted a security interest in the assets of both Debtors, terminated Debtors' line of credit and offset approximately $270,000 in funds in the Debtors' operating accounts at the bank.

The Debtors commenced these Cases because, after the offset, they lacked sufficient cash to operate their businesses without the protections afforded by a bankruptcy filing and they wanted to preserve the assets of their estates for the benefit of all of their stakeholders. The Debtors filed these Cases with the intent of reorganizing; however, through the course of the cases, the Debtors have come to decide that an orderly liquidation under Chapter 11 of the Bankruptcy Code will maximize the return to all their creditors. The Debtors' original Plan of liquidation was filed on September 6, 2006.

B. Post-Filing Activity

After commencing these Chapter 11 Cases, the Debtors' strategies included (i)liquidating low volume stores; (ii) increasing inventory at higher volume stores; (iii) reducing overhead; (iv) evaluating sales trends; (v) limiting Book Market's operations to stores open or almost ready to open as of the Petition Date; and (vi) evaluating the viability of other business options.

Shortly after the filing of these Chapter 11 Cases, National Book Warehouse, Inc. obtained Court approval to liquidate the inventory at approximately 25 low volume stores through going-out-of-business sales, which generated $1,700,000 in reserves and approximately $1,000,000

in cash in excess of store operating costs as of late August 2006. The going-out-of business sales continue at most of these locations with approximately 700,000 inventory units remaining of the 1,300,000 units with which the sales started. National Book Warehouse anticipates that the last of these stores will close in November.

The Debtors evaluated the viability of other business options. After speaking with various financial and related interested parties, the Debtors determined that a sale of the company was not a viable option as there was little interest in purchasing the company while the Debtors were in bankruptcy and while sales trends were still negative. The Debtors also pursued the option of merging with another company in the bargain book industry, which would have allowed a significant cut in the company's overhead; however, the potential merger partner never committed to the proposed transaction.

The current owners of the Debtors also considered proposing a plan of reorganization that would call for the Debtors to continue their business operations at a reduced size. Such a plan would have required a significant infusion of capital, and even with such an infusion, there was a significant risk that post-bankruptcy operations would not be profitable if current negative sales trend continued. Thus, the Debtors determined that reorganizing and emerging from bankruptcy on its own without a strategic partner was too risky.

Under these circumstances, the Debtors have determined that the best option for all creditors is a total liquidation. The Plan provides that the Debtors will continue their on-going liquidation sales until store closings are warranted. The Debtors will also request authority under § 363 of the Code to liquidate the remainder of their assets through extended going-out-ofbusiness sales. The closing sales will commence after Debtors receive Court approval to conduct those sales, which is expected to be in late September or early October. The Debtors will monitor sales at these locations and will close stores when appropriate. The Debtors expect to cease some sales and close some stores as early as the end of December 2006 and the remainder by the end of January 2007. Any stores remaining open after January 2007 will close no later than February 28, 2007, when all of Debtors' operations will cease. The extended liquidation sales will take advantage of the upcoming holiday selling season and will allow Debtors the time needed to liquidate inventory currently in their warehouse. Further, from now until the cessation of operations, the Debtors will consider any offers for a purchase of all or portions of the Debtors' operations or assets. If favorable offers are received, the Debtors will seek Court authority to consummate these transactions through § 363 of the Bankruptcy Code.

The Debtors expect to net more than $5,000,000 in proceeds from the liquidation sales after payment of operating costs. The Debtors also expect to obtain some additional proceeds from the liquidation of equipment and store fixtures and in connection with a settled class action against certain credit card companies. After payment of Secured Claims, Priority Claims and Administrative Expense Claims, the Debtors expect to have approximately $3,500,000 or more to distribute to Holders of

4-U.S. Bankruptcy Court, M.D. Tenn.

Case 3:06-bk-02227    Doc 599    Filed 05/23/07    Entered 05/23/07 08:38:25    Desc Main
Document    Page 4 of 10

Allowed Unsecured Claims against NBW and to fund pursuit of Causes of Action and/or Avoidance Actions and to pay other wind-down expenses.

. . .

(b) Joint Administration

By order entered May 10, 2006, the Debtors' cases were consolidated for procedural purposes only and are administered jointly under the case name and number for National Book Warehouse, Inc., Case No. 06-02227. Proofs of claims are to be filed under the case name and number for the Debtor against which they are filed.

. . .

(f) Cash Collateral Use and Post-Petition Financing

At the commencement of these Chapter 11 Cases, SunTrust Bank asserted a security interest in all of the Debtors' assets. The Debtors also believed that, after the offset of funds by SunTrust Bank, that the Debtors would need post-petition financing in order to pay their employees and other necessary post-petition operating expenses. Thus, upon the commencement of these Chapter 11 Cases, the Debtors filed a motion to obtain post-petition secured financing from SunTrust Bank, and for authority to use cash collateral in which SunTrust Bank, asserted an interest. This motion was approved by the Court.

As a result of careful cash management, the Debtors never had to borrow any funds under the approved post-petition financing. The post-petition financing expired pursuant to its terms on August 11, 2006.

In late May or early June, SunTrust Bank notified National Book Warehouse that SunTrust's UCC-1 filing with the State of Delaware had lapsed shortly before the filing of these cases. As a result, SunTrust Bank no longer asserts that it held as of the Petition Date a perfected security interest in the assets of Debtor National Book Warehouse. SunTrust Bank does assert a first priority security interest in the assets of Debtor Book Market, Inc. The Debtors continue to use Book Market cash collateral with the consent of SunTrust Bank, on terms set forth in a cash collateral order. In particular, this order provides that SunTrust Bank has a security interest in the assets of the Debtor National Book Warehouse Inc. to the extent that the value of SunTrust Bank's Book Market collateral as of the Petition Date diminishes as a result of National Book Warehouse's use of this collateral or proceeds of this collateral.

By orders dated June 16, 2006 and July 24, 2006, the Debtors were authorized on an interim and final basis to purchase not more than $600,000 worth of inventory on credit from American Book Company. Payment for product purchased is due 90 days from the date of American Book Company's invoice, and amounts due to American Book Company for these purchases are secured by a lien on the Debtors' inventory. The Debtors purchased a total of approximately $540,000 in inventory pursuant to this Order and have paid American Book Company all amounts believed to be due for these purchases.

Particularly as to Suntrust's claim' the plan and disclosure statement provides;

> <u>Class 1B</u>: It is the Debtor's position that SunTrust Bank's secured claim totals One Million Two Hundred Fifty Thousand Dollars ($1,250,000). Any creditor or party in interest, including SunTrust Bank, may object to the allowance of SunTrust Bank's secured claim in the amount of One Million Two Hundred Fifty Thousand Dollars ($1,250,000); any such objection shall be filed within five (5) days after the Confirmation Date. If no such objection is timely filed, then the allowed amount of SunTrust Bank's secured claim shall be One Million Two Hundred Fifty Thousand Dollars ($1,250,000). If any objections are timely filed, then a hearing shall be held thereon.

Both Suntrust and the Committee filed objections to the amount of Suntrust's allowed claim in accordance with the provisions of the confirmed plan. Initially the Committee contended that pursuant to 11 U.S.C. § 506(a) and the United States Supreme Court's decision in ***Associates Commercial Corp. V. Rash***, 520 U.S. 953 (1997) that Suntrust's claim should be valued as of the confirmation date of the plan and utilizing a liquidation standard. Suntrust argued that valuation under § 506 and ***Rash*** should occur as of the petition date and using a replacement cost standard. At the summary judgment hearing, however, the parties agreed that the timing of valuation is the petition date, but disagree as to which valuation standard applies.

### *B. Standards for Summary Judgment*

Bankruptcy Rule of Bankruptcy Procedure 7056 provides that summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitle to a judgment as a matter of law." On motion for summary judgment, the evidence, all facts, and any reasonable inferences that may be drawn from the facts must be viewed in the light most favorable to the nonmoving party. ***Matsushita Elec. Indus. Co. v. Zenith Radio Corp.***, 475 U.S. 574, 587 (1986).

6-U.S. Bankruptcy Court, M.D. Tenn.

Case 3:06-bk-02227   Doc 599   Filed 05/23/07   Entered 05/23/07 08:38:25   Desc Main
Document      Page 6 of 10

The only issue remaining for determination by the court in the context of the summary judgment motions is the standard for valuation of Suntrust's claim. The court finds that no material facts remain in dispute to the extent that the court grants summary judgment herein.

### *C. Discussion*

All parties agree that valuation is to occur in accordance with the United States Supreme Court's decision in ***Rash***. In ***Rash,*** the Supreme Court held that the first sentence of § 506(a) provides that the value of the collateral is a limitation on an allowed secured claim. The Supreme Court also found that where a debtor wishes to retain and use collateral pursuant to his plan over the objection of a secured creditor, the value of the secured creditor's interest under § 506(a) is measured by what the debtor would incur to obtain like property for the same proposed use (the "replacement-value standard"). ***Rash*** was decided in the context of a chapter 13, but ***Rash***'s application to Chapter 11 is not really in doubt. **See Matter of T-H New Orleans Ltd. P'ship**, 116 F.3d 790 (5th Cir. 1997); **In re Preventive Maintenance Services, Inc.,**, 359 B.R. 607 (Bankr. W.D. La. 2007); **In re TennOhio Transp. Co.,** 269 B.R. 775 (Bankr. S.D. Ohio 2001).

Although the parties agree on ***Rash*** as the governing standard, they do not agree as to ***Rash***'s application to this case. Suntrust advocates replacement cost and the Committee argues that this was "deathbed" reorganization that requires valuation to occur based on liquidation values.

The court finds that the Supreme Court's decision in ***Rash*** requires replacement value for purposes of valuation. However, as the Supreme Court noted, the actual

Case 3:06-bk-02227   Doc 599   Filed 05/23/07   Entered 05/23/07 08:38:25   Desc Main
Document      Page 7 of 10

amount to be placed on the replacement cost is left to the bankruptcy court as trier of fact:

> Our recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property. We note, however, that replacement value, in this context, should not include certain items.

*Rash* 117, S.Ct. At 1886 n.6 (internal citations omitted). A thorough reading of *Rash* indicates that the phrase "replacement value" is a term of art, and that what courts are supposed to determine under § 506(a) is the fair market value of the collateral securing the claim. *In re Richards,*, 243 B.R. 15 (Bankr. N.D. Ohio 1999).

In this case, it is undisputed that liquidation measures had begun even prior to bankruptcy. The debtor's disclosure statement indicates that:

> For the year ended December 31, 2005, the Debtors had unaudited gross revenues on a consolidated basis in excess of $51,000,000 and net loss including interest expense of approximately $4,000,000.
> The Debtors had 134 permanent stores and 62 temporary stores as of December 2005. . . The Debtors closed more than 30 National Book Warehouse stores and significantly reduced overhead in an effort to stabilize the business and facilitate continued operations. Unfortunately, sales at the on-going stores were less than budgeted during the first months of 2006.

The case was filed on May 9, 2006. In less than one month's time, the debtors had begun to liquidate their inventory in court-approved going-out-of-business sales. Within three months, the debtors had formally announced their intention to orderly liquidate within chapter 11. By September 6, just four months into the case, the debtors filed their first proposed plan contemplating complete liquidation. Thus, as of

the petition date, when valuation is to occur in this instance, the debtors were already in partial liquidation mode, but continued business operations for the very short-term to maximize the proceeds of the eventual total liquidation of the debtors' estates.

In *In re Getz*, the Sixth Circuit BAP affirmed the bankruptcy court's determination of "replacement cost" of a vehicle at a value reached by averaging the N.A.D.A. wholesale and retail values as a starting point. ***See In re Getz***, 242 B.R. 916 (6th Cir. BAP 2000). That same approach seems appropriate in this case given the undisputed fact that this case is a well-blended mixture of both retail and fire sale circumstances.

Accordingly, the court finds that replacement cost is the appropriate standard for valuation in these cases pursuant to ***Rash***'s mandate. Replacement costs in these cases is the average of the liquidation value and the retail value as of the petition date.

### *D. Conclusion*

The court grants in part and denies in part the summary judgment motions of both Suntrust and the Committee. The court finds no material facts remaining in dispute to the extent the summary judgment motions of both parties are granted. In accordance with 11 U.S.C. § 506(a) and the United States Supreme Court's decision in ***Rash***, the court finds that "replacement cost" is the appropriate standard for valuation as of the petition date in this case. Given the particular situation of these debtors, the court finds that the replacement cost for purposes of valuation of Suntrust's claim is equal to the average of the retail cost and liquidation costs as of the petition date.

The court's ruling does not resolve all the issues between the parties. As was

admitted during the summary judgment hearing, the court is unable, based upon materially disputed facts, to determine the exact dollar amount of Suntrust's claim. To that extent the motions for summary judgment of both Suntrust and the Committee are denied.

The court will instruct counsel for all parties to jointly prepare an order reflecting the decision of the court within five (5) days of entry of this Memorandum. The order shall set a further pretrial conference on an agreed upon date after consultation with the court's calendar.

***THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY
AS INDICATED AT THE TOP OF THE FIRST PAGE.***